**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

BRIAN S.,[1]

      Plaintiff,

          v.                        CIVIL NO. 3:20cv065 (JAG)

ANDREW M. SAUL,
Commissioner of Social Security,

      Defendant.

**REPORT AND RECOMMENDATION**

      This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits under the Social Security Act. Brian S. ("Plaintiff"), thirty-nine years old at the time of his benefits application, has the equivalent of a high school education and previously worked as a sales representative for a restaurant supply business. (R. at 84, 1771-72, 1785-86.)

      Plaintiff suffers from numerous physical ailments, resulting in shoulder, ankle, foot, hip, and knee pain, as well as fainting spells, rheumatoid arthritis, and various mental health disorders. (R. at 1764.) Plaintiff asserts that his combined impairments prevent him from working and render him disabled, in that they affect his ability to be around people; cause issues with gripping and picking up items; and restrict his ability to stand, walk, and drive. (R. at 1791-92, 1796, 1798-1800, 1804.)

---

[1]     The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

On January 24, 2019, an Administrative Law Judge ("ALJ") denied Plaintiff's application for disability insurance benefits. Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in his finding that Plaintiff is "not disabled." Plaintiff contends that the ALJ (1) erroneously assessed Plaintiff's residual functional capacity in multiple respects, including failing to provide a narrative discussion of the ALJ's conclusions, failing to account for the combination of Plaintiff's impairments, failing to provide or explain Plaintiff's limitation in concentration or task persistence, and incorrectly assessing Plaintiff's GAF score; and (2) erred in relying on the testimony of the vocational expert. (Pl.'s Br. in Supp. of Pl.'s Mot. For Summ. J. 4-19,[2] ECF No. 14 ("Pl.'s Mem.").)

This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross motions for summary judgment, rendering the matter ripe for review.[3] For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On August 21, 2013, Plaintiff applied for disability insurance benefits. (R. at 183.) After Plaintiff's application was denied, and after exhausting his administrative remedies, Plaintiff

---

[2]    The Court employs the pagination assigned by the Court's CM/ECF docketing system for citations to Plaintiff's submissions.

[3]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

commenced an action for judicial review of the Commissioner's final decision. On January 26, 2017, the Court granted the Commissioner's consent motion to remand. *Smith v. Colvin*, No. 3:16cv527 (E.D. Va. Jan. 26, 2017) (ECF No. 15). On remand, the Appeals Council vacated the Commissioner's final decision and remanded Plaintiff's claim to the ALJ for further administrative proceedings. (R. at 1846-47.) On September 27, 2018, the ALJ held a second hearing. (R. at 1781.) On January 24, 2019, the ALJ issued a second written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 1761-73.) On December 6, 2019, the Appeals Council determined that Plaintiff's written exceptions did not provide a basis for changing the ALJ's decision. (R. at 1752.) Accordingly, the ALJ's decision became the final decision of the Commissioner, subject to review by this Court. (R. at 1752-53.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x 264, 266

3

(4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (alteration in original) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the ALJ based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If substantial evidence in the record supports the ALJ's findings as to any fact, it is binding on the reviewing court regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *See id*.

Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most the claimant can do despite his physical and mental limitations. § 404.1545(a). At step

4

four, the ALJ assesses whether the claimant can perform his past work given his residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

## III. FACTUAL BACKGROUND

In rendering the decision to deny Plaintiff's disability benefits claim, the ALJ considered the following relevant evidence.

### A. Plaintiff's Background

Plaintiff, thirty-nine years old at the time of his benefits application, has the equivalent of a high school education. (R. at 84, 1772, 1785-86.) From 2001 to 2008, Plaintiff worked as a sales representative for a restaurant supply business, and since 2008, has not worked. (R. at 1787-88.) According to his testimony, Plaintiff has difficulties with reading and writing, including reading instructions at work. (R. at 1786-87.) At the time of his hearing, Plaintiff lived with his two minor children, ages thirteen and fifteen. (R. at 1789.)

Plaintiff contends that he suffers from fainting; pain in his hands, which causes issues with typing, writing, and gripping items; and pain in his knees, ankles, hips and feet, which causes issues with standing, walking, and driving. (R. at 1790-93.) Plaintiff also suffers from depression and anxiety. (R. at 1800.) Plaintiff reported that he relies on his children to help with household chores, though he can manage his personal needs, like bathing and dressing, on his own. (R. at 1796.) Due to concerns with fainting, Plaintiff reports that he rarely drives. (R. at 1789.)

### B. Plaintiff's Shoulder Pain

From 2007 to 2009, Plaintiff sought treatment regarding shoulder pain from various physicians. (R. at 294-95, 329-32, 352-53, 1767-68.) In May 2007, Dr. William O'Grady examined Plaintiff and reviewed imaging of Plaintiff's shoulder. (R. at 352-53.) According to Dr. O'Grady,

Plaintiff had unremarkable imaging of the rotator cuff, biceps tendon, and labrum, and showed slight degenerative changes at the glenohumeral joint. (R. at 352.) Later in 2007, Plaintiff sought treatment from Dr. Raymond Chung, who noted that, despite Plaintiff's symptoms "settling down," given Plaintiff's "arthritic condition, he still may require either injections or potentially even surgery in the future." (R. at 296.) Due to his recurring symptoms, in June 2008, Plaintiff elected to proceed with a distal clavicle resection via surgical intervention. (R. at 334.)

Following his shoulder surgery, Plaintiff was treated by Dr. Erik Krushinski in 2009. (R. at 329-331.) Upon examination, Dr. Krushinski found that Plaintiff "showed normal [rotator cuff] and biceps tendon" and a normal labrum, but had either "slight" or simply "degenerative changes" in two of the shoulder joints. (R. at 329.) Plaintiff reportedly experienced "no improvement" from his surgery, but upon examination, "[w]hen distracted" showed improved external rotation. (R. at 329.) Dr. Krushinski stated that he would not recommend further surgical treatment of Plaintiff's shoulder. (R. at 329.) Ultimately, Dr. Krushinski referred Plaintiff back to Dr. Chung "for further conservative treatment," stating that he "would recommend continued [physical therapy]." (R. at 331.)

In follow-up visits with Dr. Chung in May and June 2009, Plaintiff reported pain around his neck and medial scapula, and numbness in his arm. (R. at 332-33.) Dr. Chung opined that he did not believe there were any mechanical issues that would be amenable to surgical treatment and that Plaintiff's current arm symptoms were likely not related to his shoulder, instead suggesting that Plaintiff "may have some other issues regarding his neck with cervical radiculopathy or cubital tunnel type issue[s]". (R. at 332-33.) Following Dr. Chung's treatment, Plaintiff underwent an MRI of the cervical spine in October 2009. (R. at 370-71.) Dr. Thelma Lopes, in reviewing the MRI imaging, found that Plaintiff had broad-based disc herniation, "causing flattening and

deformity of the cord and mild central canal and bilateral neural foraminal narrowing." (R. at 371.) Following Dr. Lopes' examination, Plaintiff underwent a neurosurgical consultation with Dr. Arthur Kobrine, who found that Plaintiff "reveals normal strength, tone and reflex" though showed mild weakness of his left triceps; decreased sensation to light touch over the middle, ring, and little finger of his left hand; and tenderness of the ulnar nerve. (R. at 360-61.) Dr. Kobrine opined that Plaintiff "is a good candidate for a two level anterior cervical diskectomy and fusion." (R. at 360-61.)

### C. Plaintiff's Ankle, Foot, Hip, and Knee Pain

Beginning in 2010, Plaintiff sought treatment for pain in his ankle, knee, and foot. (R. at 365, 1768-69.) Examination of Plaintiff's ankle, in November 2010, revealed good alignment, motion, and stability, and "no effusion of the ankle." (R. at 365.) In 2012, Plaintiff underwent a series of imaging and examinations relating to pain in his ankle, knee, and foot. (R. at 398-403.) Radiology reports concerning Plaintiff's ankle revealed: no fracture, no subluxation, no ankle joint effusion, small bilateral plantar calcaneal spurs, and no acute osseous injury "with either foot or ankle." (R. at 402.) Radiology reports concerning Plaintiff's knee revealed very small joint effusion, trace amounts of fluid in the semimembranosus gastrocnemius bursa, mild patellar chondromalacia, and no meniscal or ligament tear. (R. at 398.) Radiology reports concerning Plaintiff's foot revealed unremarkable alignment and soft tissues, no fracture or dislocation, and spurring at the Achilles tendon insertion. (R. at 400.) Plaintiff also underwent a bone density scan, following complaints of pain in his left hip. (R. at 579.) Results of the scan showed normal bone density of the left femoral neck and lumbar spine. (R. at 579.) In June 2013, Plaintiff underwent

an elective opening wedge osteotomy of his right foot, due to longstanding bunion deformities and Hallux Valgus[4] of the right foot. (R. at 440.)

Plaintiff has a history of treatment for rheumatoid arthritis and was prescribed hydroxychloroquine to help with joint pain. (R. at 740, 772.) After Plaintiff underwent neurology imaging and examination, he was instructed to discontinue hydroxychloroquine. (R. at 740.)

### D. Plaintiff's Fainting and Seizure-like Episodes

In 2013, Plaintiff passed out and exhibited seizure-like episodes where Plaintiff lost consciousness and experienced upper and lower extremity twitches. (R. at 500.) While at the hospital, Plaintiff had an echocardiogram, which showed normal ejection fraction; an Electroencephalogram ("EEG") of the brain, which showed normal results; an MRI scan of the brain, which showed no acute intracranial findings; and a CT scan of the head, which showed no acute intracranial pathology. (R. at 500.) Plaintiff's attending physician at the hospital, Dr. Hammad Hafeez, recommended that Plaintiff not receive any antiepileptic medication and that, etiology of Plaintiff's fainting episodes was unclear but was "not a seizure." (R. at 501.)

### E. Plaintiff's Depression and Anxiety

Plaintiff contends he has suffered from depression and anxiety since he was a child. (R. at 1800.) Relevant to the instant case, Plaintiff received intermittent treatment for mental health in 2013 and 2014. Dr. Rosier Dedwylder treated Plaintiff in 2013 for Plaintiff's anxiety, fearful thoughts, depressed mood, fatigue, and panic attacks. (R. at 591.) In her examination notes, Dr. Dedwylder notes Plaintiff's depressed affect, hopelessness, and mood swings, but also highlights

---

4   Hallux Valgus is a progressive foot deformity which is described as "[a] deviation of the distal portion of the great toe, at the metatarsophalangeal joint, toward the outer or lateral side of the foot." *Hallux valgus*, *Stedmans Medical Dictionary* (27th ed. 2000), Westlaw STEDMANS 391350.

Plaintiff's absence of memory loss, obsessive thoughts, and paranoia; normal attention span and concentration; and normal insight and judgment. (R. at 592.) In a subsequent 2013 examination, Dr. Dedwylder notes that Plaintiff has "continued to have a lot of different neurologic and musculoskeletal symptoms," and cites somatoform disorder.[5] (R. at 566.)

In 2014, Dr. Sara Phillips performed a mental status evaluation of Plaintiff. (R. at 763.) In her evaluation, Dr. Phillips noted Plaintiff's complaints of physical pain and "fainting spells." (R. at 763.) Dr. Phillips further noted Plaintiff's tendency to socially isolate, finding that Plaintiff "is describing symptoms consistent with depression." (R. at 764-65.) Dr. Phillips performed a Mini-Mental State Exam, in which Plaintiff obtained a score of 26, "which places him within the Normal or Average range" and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 50. (R. at 765.) Despite Plaintiff's depression, Dr. Phillips noted Plaintiff's cooperative mood, ability to follow a three-step command, and Plaintiff's performance in completing "serial sevens."[6] (R. at 764-65.)

Plaintiff also underwent a neuropsychological evaluation with Dr. Sarah Wood in 2014. (R. at 769-73.) Dr. Wood reviewed Plaintiff's symptoms of depression and anxiety, as well as his physical ailments, including Plaintiff's history of rheumatoid arthritis. (R. at 770.) Dr. Wood provided a series of assessment results in various areas of functioning, including attention, learning and memory, motor functioning, and emotional functioning. (R. at 771-72.) Dr. Wood found that

---

[5]    "[A] group of disorders in which physical symptoms suggesting physical disorders for which there are no demonstrable organic findings or known physiologic mechanisms, and for which there is positive evidence, or a strong presumption that the symptoms are linked to psychological factors; e.g., hysteria, conversion disorder, hypochondriasis, pain disorder, somatization disorder, body dysmorphic disorder, and Briquet syndrome." *Somatoform disorder*, *Stedmans Medical Dictionary* (27th ed. 2000), Westlaw STEDMANS 260650.

[6]    Serial sevens is "a test involving the serial subtraction of seven beginning with the number 100. It is a conventional part of mental status evaluations of patients." *Proenza v. Saul*, No. 19-24147, 2020 WL 6162850, at *5 n.3 (S.D. Fla. Aug. 4, 2020).

Plaintiff performed within normal limits of some measures of attention, but scored in the low average range on tasks requiring Plaintiff to learn and recall short stories. (R. at 771.) Regarding Plaintiff's motor skills, Dr. Wood found Plaintiff's fine motor dexterity and hand-eye coordination to be average. (R. at 772.) Dr. Wood found Plaintiff's emotional functioning to reflect "significant distress, particularly in the areas of depressive symptoms and concern about his physical wellbeing." (R. at 772.) Dr. Wood found, given Plaintiff's "reported numerous pain symptoms[,] in addition to syncopal episodes[,] the latter of which cannot be explained by a medical condition and the former of which results in significant social and occupational impairment, [Plaintiff] meets criteria for a diagnosis of undifferentiated somatoform disorder." (R. at 772.) Overall, Dr. Wood found the results of Plaintiff's evaluation to "suggest that [Plaintiff] has many areas of intact cognitive functioning despite fluctuating task engagement" and that Plaintiff's "subjective cognitive concerns are likely related to his emotional functioning, which warrants further evaluation." (R. at 772.)

## IV. THE ALJ'S DECISION

On September 27, 2018, the ALJ held a hearing during which Plaintiff, represented by counsel, and a vocational expert testified. (R. at 1781-1813.) On January 24, 2019, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 1765-73.)

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 1765-73.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from his alleged onset date of June 20, 2008. (R. at 1764.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: left shoulder impairment, degenerative disc disease of the cervical spine, rheumatoid arthritis,

osteoarthritis, syncope, right knee impairment, right Hallux Valgus deformity, somatoform disorder, depressive disorder, and anxiety disorder. (R. at 1764.)

At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1764-66.) After step three, the ALJ determined Plaintiff's residual functional capacity based on an evaluation of the evidence, including Plaintiff's testimony, the findings of treating and examining health care providers, and Plaintiff's medical record. (R. at 1766-71.) Based on this evidence, the ALJ determined that Plaintiff retained the ability to perform sedentary work with the following limitations:

> [Plaintiff] could not tolerate even occasional exposure to workplace hazards such as unprotected heights and moving mechanical parts, and could occasionally climb ramps and stairs or occasionally balance, stoop, kneel, crawl, or crouch. In addition, [Plaintiff] could never climb ladders, ropes, or scaffolds, could not reach overhead bilaterally, could engage in no more than frequent reaching in every other direction, and could engage in no more than frequent handling and fingering bilaterally. [Plaintiff] was additionally limited to performing simple and routine tasks that were not performed at a production rate such as that found in an assembly-line setting and with instructions that were primarily spoken rather than written. In addition, the claimant could tolerate no more than occasional workplace changes, could exercise little independent decision-making, and could not take responsibility for the safety of others. Furthermore, [Plaintiff] could perform work that involved no contact with the public and no more than occasional contact with supervisors or co-workers.

(R. at 1766.)

Based on this determination, the ALJ then considered, at step four, whether Plaintiff could perform his past relevant work. (R. at 1771-72.) In making this determination, the ALJ determined that the demands of Plaintiff's past work as a restaurant supply sales representative exceeded Plaintiff's residual functional capacity. (R. at 1772.) The ALJ therefore determined that Plaintiff was unable to perform past relevant work. (R. at 1772.)

At step five, the ALJ considered whether Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 1772-73.) The ALJ weighed the testimony of the vocational expert, who opined that Plaintiff would be able to perform the requirements of representative occupations such as type copy examiner, conductor bonder, and surveillance system monitor. (R. at 1772.) The ALJ determined that, given Plaintiff's age, education, work experience, residual functional capacity, and limitations, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 1773.) The ALJ, therefore, concluded that a finding of "not disabled" was appropriate. (R. at 1773.)

## V. ANALYSIS

Plaintiff's appeal to this Court challenges the ALJ's finding of "not disabled," arguing that the ALJ erred in (1) formulating Plaintiff's residual functional capacity in numerous ways, and (2) relying upon the vocational expert's testimony, since the ALJ failed to include all of Plaintiff's residual functional capacity limitations in the hypothetical question posed to the vocational expert. (Pl.'s Mem. at 6-21.)

### A. The ALJ Properly Formulated Plaintiff's Residual Functional Capacity.

Plaintiff argues that the ALJ erred in crafting Plaintiff's residual functional capacity in five principal ways: (1) failing to provide a narrative discussion of the ALJ's residual functional capacity conclusions, (2) erroneously interpreting Plaintiff's GAF score of 50, (3) failing to account for the combination of Plaintiff's impairments, (4) failing to provide or explain Plaintiff's limitation in concentration or task persistence, and (5) failing to explain how Plaintiff could maintain concentration and pace for at least eighty-five percent of the workday. (Pl.'s Mem. at 8-21.)

1. <u>The ALJ Adequately Provided a Narrative Discussion Setting Forth How the Evidence Supported the ALJ's Residual Functional Capacity Conclusions.</u>

Plaintiff first argues that the ALJ failed to provide a narrative discussion that explains how the evidence cited resulted in the conclusions reached regarding Plaintiff's residual functional capacity. (Pl.'s Mem. at 9-10.) Defendant responds that the ALJ included a narrative discussion of how the evidence supports his conclusions, thereby permitting meaningful review. (Def.'s Mot. Summ. J. & Br. in Supp. Thereof 17-21, ECF No. 15 ("Def.'s Mem.").)

After step three of the ALJ's analysis, but before making a determination whether the claimant can perform past relevant work, the ALJ must assess the claimant's residual functional capacity. § 404.1545(a). Residual functional capacity "is 'the most' the claimant 'can still do despite' physical and mental limitations that affect [the claimant's] ability to work." *Mascio*, 780 F.3d at 635 (quoting § 416.920(a)(4)). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's limitations and then determine the claimant's residual functional capacity for work activity on a regular and continuing basis. § 404.1545(b). The residual functional capacity formulation must incorporate impairments supported by objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. § 404.1529(a). Moreover, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; *see also* SSR 96-8p, 1996 WL 374184 (July 2, 1996) (stating that the residual functional capacity "assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). A residual functional capacity determination is reserved for the ALJ alone. § 404.1527(d)(2).

In crafting the residual functional capacity, an ALJ must conduct a function-by-function analysis, including a "narrative discussion describing how the evidence supports each conclusion,

citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio*, 780 at 636. When arriving at his conclusions regarding the claimant's residual functional capacity, the ALJ must "build an accurate and logical bridge from the evidence to [the ALJ's] decision" in order for the reviewing court to evaluate the ALJ's decision. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

In the instant case, the ALJ formulated Plaintiff's residual functional capacity after providing a narrative discussion of the evidence, including Plaintiff's testimony, Plaintiff's medical records, and opinion evidence. (R. at 1766-71.) The ALJ considered Plaintiff's testimony regarding Plaintiff's physical pain, syncope, anxiety, and depression in relation to the medical record and ultimately determined that Plaintiff's "impairments were not of a disabling character," despite receiving treatment. (R. at 1767.) The ALJ then reviewed Plaintiff's medical record, providing a chronological, synthesized history of Plaintiff's treatment. (R. at 1767-70.)

Regarding Plaintiff's shoulder pain, the ALJ noted the 2007 findings of Dr. O'Grady, who opined that, despite evidence of inflammatory degenerative AC joint disease and slight degenerative changes at the glenohumeral joint, the MRI study was "otherwise unremarkable," showing no rotator cuff or labrum tear. (R. at 352-55, 1767.) The ALJ further reviewed Dr. Krushinski's 2009 treatment notes, which show that, despite Plaintiff's alleged persisting shoulder pain, "when distracted," Plaintiff was able to improve his external rotation. (R. at 329-31, 1768.) The ALJ found that such behavior suggested that Plaintiff "may have been engaging in symptom magnification." (R. at 329-31, 1768.) Dr. Krushinski further opined that x-ray examination showed no obvious degenerative changes and found that there was "no indication for further surgical intervention." (R. at 329, 331, 1768.) The ALJ also reviewed Dr. Chung's treatment notes from

14

later in 2009, which showed Plaintiff's continued tenderness in his shoulder and neck, but noted that Plaintiff did "not have any gross intrinsic atrophy or weakness" or any underlying "mechanical issues that would be amenable to surgical treatment." (R. at 332, 1768.) Lastly, the ALJ underscored Dr. Kobrine's December 2009 evaluation notes, which showed that, despite Plaintiff's disc herniation and protrusion, Plaintiff had normal strength, tone, and reflexes in his upper extremities. (R. at 360-61, 1768.)

Regarding Plaintiff's ankle, foot, and knee pain, the ALJ reviewed Plaintiff's treatment notes, which reveal some evidence of tenderness, mild patellofemoral chondromalacia, "very small" joint effusion, and a Hallux Valgus deformity. (R. at 398-403, 440, 1768-69.) Despite these symptoms, Plaintiff was negative for signs of a meniscus or ligament tear and showed no signs of effusion. (R. at 398-403.) The ALJ also underscored that, particularly in 2010 and 2011, when Plaintiff chiefly complained of ankle, foot, and knee pain, there were "significant gaps in treatment," which the ALJ found to "undercut[] the claimant's allegation that his impairments were of a disabling character." (R. at 1768.)

Regarding Plaintiff's fainting and seizure-like episodes, the ALJ reviewed the findings of Dr. Hafeez, who indicated that Plaintiff may be experiencing "possible syncope episodes." [7] (R. at 500, 1769.) The ALJ further noted that an EEG study and MRI of Plaintiff's brain "was seen to be unremarkable." (R. at 499, 1769.)

Finally, before assigning weight to the opinions of various treating and examining physicians, the ALJ reviewed the medical record concerning Plaintiff's mental impairments,

---

[7]     "Syncope [] is another word for fainting or passing out. Someone is considered to have syncope if they become unconscious or go limp, then soon recover." *Syncope (Fainting)*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/syncope-fainting (last visited Feb. 8, 2021).

including depression and anxiety. (R. at 1769.) The ALJ noted the 2013 assessment by Dr. Dedwylder, who found that Plaintiff displayed symptoms of depressive thoughts, fear, diminished energy, and panic attacks. (R. at 591, 1769.) Despite these symptoms, however, Dr. Dedwylder noted Plaintiff's normal speech, fair insight and judgment, and normal attention and concentration skills. (R. at 592.) Dr. Dedwylder further opined that Plaintiff's symptoms were consistent with a diagnosis of somatoform disorder. (R. at 566.)

The ALJ then synthesized Plaintiff's testimony, alleged symptoms, and medical record, and explained the limitations in Plaintiff's residual functional capacity. (R. at 1769.) Regarding Plaintiff's intermittent symptoms of depression and anxiety, the ALJ emphasized that there is no indication Plaintiff engaged in acts of self-harm or required emergent treatment or psychiatric hospitalizations. (R. at 1769.) Further, while Dr. Dedwylder's treatment notes provided that Plaintiff previously reported taking psychiatric medication, the ALJ underscored that Plaintiff "was not taking medications presently." (R. at 591-93, 1769.) Nevertheless, to account for Plaintiff's alleged symptoms, the ALJ limited Plaintiff to simple, routine tasks, and further limited Plaintiff to only occasional workplace changes. (R. at 1769.) The ALJ found that Plaintiff should not be responsible for the safety of others, could exercise little independent decision-making, and should have no contact with the public and no more than occasional contact with supervisors and co-workers. (R. at 1769.) The ALJ explained that these limitations "account for the claimant's depressive thoughts, difficulty maintaining concentration, and his symptoms of anxiety, which impacted his ability to interact with others." (R. at 1769.)

Regarding Plaintiff's physical ailments, the ALJ underscored that the results of Plaintiff's medical imaging and tests often revealed "unremarkable" findings and "mild" or "slight" impairments, despite the fact that Plaintiff's medical record contains an array of ailments. (R. at

352 (unremarkable imaging of rotator cuff, biceps tendon, and labrum and slight degenerative changes at the GH joint), 398 (mild patellar chondromalacia), 400 (unremarkable foot alignment and soft tissues), 501 (unremarkable brain MRI, EEG, and echocardiogram).) Nevertheless, similar to the ALJ's approach regarding Plaintiff's mental limitations, the ALJ crafted relevant limitations to account for Plaintiff's alleged symptoms. (R. at 1769.) Regarding Plaintiff's complaints of "diffuse pain," the ALJ limited Plaintiff to sedentary work, despite the "incongruity between the claimant's physical complaints and objective diagnostic evidence," as discussed above. (R. at 1769.)

The ALJ concluded the residual functional capacity analysis by reviewing and assigning weight to the opinions of treating and examining physicians. (R. at 1770-71.) Finding that both opinions were generally consistent with the medical record, ALJ assigned significant weight to the opinions of Drs. Phillips and Wood. (R. at 1770-71.) The ALJ underscored Dr. Phillips' findings that, despite having some memory deficits, Plaintiff could follow three-step commands. (R. at 764-65, 1770.) Dr. Wood, who performed a neuropsychological evaluation of Plaintiff in January 2014, noted that Plaintiff's complaints of pain could not be fully explained by objective medical evidence and opined that Plaintiff suffers from undifferentiated somatoform disorder. (R. at 772.) The ALJ further reviewed the opinions rendered by Dr. Thomas Conger and Dr. Nicole Mannis, both state medical consultants, who each opined that Plaintiff has moderate limitations in social functioning, concentration, persistence, and pace. (R. at 63-64, 80-81, 1771.) Because Drs. Conger and Mannis did not personally examine Plaintiff, the ALJ assigned some weight to each opinion. (R. at 1771.)

Regarding Plaintiff's physical limitations, the ALJ reviewed the opinions of Dr. J. Biddison and Dr. E. Nakhuda, who opined that Plaintiff could lift and carry twenty five pounds frequently and fifty pounds occasionally; sit, stand, and walk six hours in an eight hour day; could frequently

climb ramps and stairs; and frequently balance, stoop, kneel, crawl, and crouch. (R. at 61-62, 78-79, 1771.) The ALJ however, assigned these opinions partial weight, due to the fact that neither physician examined Plaintiff nor reviewed Plaintiff's full medical record. (R. at 1771.)

The ALJ also reviewed the opinions regarding Plaintiff's ability to work rendered by Drs. Chung and Kobrine. (R. at 1771.) Dr. Chung opined that "it did not appear that [Plaintiff] could return back to his previous full duty work." (R. at 327.) Dr. Kobrine similarly opined that Plaintiff "appears not to be able to work regarding the pain in his left shoulder." (R. at 361.) A statement by a medical source, however, "does not mean that [an ALJ] will determine that [the claimant] is disabled"—opinions on such issues are reserved to the Commissioner. § 404.1527(d)(1). In his assignment of weight to both opinions, the ALJ cited Section 404.1527, finding that both statements were "conclusory in nature and limited in temporal scope." (R. at 1771.) The ALJ, therefore, assigned little weight to Drs. Chung and Kobrine's opinions regarding Plaintiff's ability to work. (R. at 1771.)

Following his assignment of weight to the opinion evidence, the ALJ concluded that, "[u]ltimately, the exertional, postural, manipulative, environmental, and mental limitations set forth herein accommodate the claimant's subjective limitations and are supported by, and consistent with, the objective medical findings." (R. at 1771.) In formulating Plaintiff's residual functional capacity, the ALJ reviewed Plaintiff's testimony and alleged symptoms, Plaintiff's medical record, including imaging, mental status examination findings, diagnoses, and treatment, as well as opinions rendered by treating and examining physicians. The ALJ included a narrative discussion describing how the evidence supports his conclusions and built "an accurate and logical bridge from the evidence to [his] conclusion." *Monroe*, 826 F.3d at 189 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Accordingly, the ALJ did not err.

2.   <u>While the ALJ Erred in Assessing Plaintiff's GAF Score, Such an Error Does Not Disturb the ALJ's Ultimate Conclusion.</u>

Plaintiff next challenges the ALJ's evaluation of Dr. Phillips' opinion. (Pl.'s Mem. at 10-11.) Specifically, Plaintiff argues the ALJ erred by incorrectly stating that a GAF score of 50 indicates "generally moderate, as opposed to marked, limitations in occupational and social functioning." (Pl.'s Mem. at 10.) Because a GAF score of 50 instead reflects serious symptoms or limitations, Plaintiff contends that the ALJ's evaluation of Dr. Phillips' opinion is not supported by substantial evidence. (Pl.'s Mem. at 11.) Defendant responds that, despite the ALJ's error in interpreting a GAF score of 50, the ALJ's residual functional capacity determination is ultimately supported by substantial evidence. (Def.'s Mem. at 22.) Further, Defendant argues, Plaintiff has not identified any harm that resulted from the ALJ's statement of the GAF score. (Def.'s Mem. at 22.)

Previously, a GAF scale was included in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM") and provided a scale on which to "[c]onsider [and rate an individual's] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 2000). In the instant case, Plaintiff underwent a psychiatric consultative examination by Dr. Phillips in February 2014. (R. at 763-65.) In her diagnoses, Dr. Phillips stated that Plaintiff described symptoms consistent with depression, anxiety, and nervousness and assigned Plaintiff a GAF score of 50. (R. at 765.) Dr. Phillips explained Plaintiff's tendency to isolate, stating that Plaintiff "doesn't want to be around people" and "can only sleep a couple hours at a time." (R. at 763-64.) Dr. Phillips also described Plaintiff's mood during the assessment as "stable," noting Plaintiff's cooperation and ability to complete the interview without difficulty. (R. at 764.)

In reviewing Dr. Phillips' examination, the ALJ stated that Plaintiff's GAF score of 50 "indicates generally moderate, as opposed to marked, limitations in occupational and social functioning." (R. at 1770.) A GAF score between the range of 41 to 50, however, actually indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 2000). It is a GAF score between 51 and 60, therefore, that indicates the "moderate" limitations suggested by the ALJ in his written decision. *Id.* The ALJ therefore erred in interpreting Plaintiff's GAF score of 50.

When confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine. *See Mascio*, 780 F.3d at 639 (analyzing whether the ALJ's error in credibility assessment constituted only harmless error); *Sharp v. Colvin*, 660 F. App'x 251, 257-58 (4th Cir. 2016) (deeming the ALJ's errors harmless). The burden of establishing a harmful error rests on the "party attacking the agency's determination." *Shineski v. Sanders*, 556 U.S. 396, 409 (2009). In determining the significance of an error, courts must consider, among other factors, "an estimation of the likelihood that the result would have been different." *Id.* at 411. Further, "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency 'can decide whether re-consideration is necessary.'" *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

Against this standard, the Court concludes that the ALJ's misstatement of Plaintiff's GAF score constitutes harmless error, given the diminishing importance of the GAF score, as well as the ALJ's treatment of Plaintiff's mental limitations. The most recent DSM edition, DSM-V, no longer includes a GAF scale, in part due to its "conceptual lack of clarity" and "questionable

psychometrics in routine practice." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013). After the DSM-V was published, the Social Security Administration issued a directive, stating that the "GAF score is never dispositive of impairment severity," that the GAF score is "only a snapshot opinion about the level of functioning," and "[b]y itself, the GAF cannot be used to 'raise' or 'lower' someone's level of function." *Emrich v. Colvin*, 90 F. Supp. 3d 480, 492 (M.D.N.C. 2015) (quoting Soc. Sec. Admin., Admin. Message 13066 (July 22, 2013)).

Subsequently, the Fourth Circuit has determined that a GAF score does not, on its own, negate other record evidence supporting an ALJ's determination whether a claimant was entitled to benefits. *Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017). While a GAF score should still be considered as opinion evidence, such scores shall not be considered in isolation. *Id.*; *see also Singletary v. Saul*, No. 1:17cv536, 2019 WL 7816859, at *2 (E.D. Va. Aug. 22, 2019). A GAF score, therefore, is to be "one of many factors the ALJ consider[s]." *Singletary*, 2019 WL 7816859, at *2.

Based on the ALJ's review of Dr. Phillips' consultative examination, it is evident that the ALJ considered not just Plaintiff's GAF score, but the other examination findings by Dr. Phillips, like Plaintiff's symptoms of depression and anxiety, ability to follow three-step commands and perform serial sevens, and Plaintiff's capability to manage his own funds. (R. at 763-65, 1770.) Moreover, as discussed above, in formulating Plaintiff's residual functional capacity, the ALJ reviewed other opinion evidence; Plaintiff's medical record, including imaging, mental status examination findings, diagnoses, and treatment; as well as Plaintiff's testimony and alleged symptoms.

Having considered this evidence, the ALJ ultimately provided for Plaintiff's depressive thoughts, difficulty maintaining concentration, and his symptoms of anxiety, "which impacted his ability to interact with others," by limiting Plaintiff to simple and routine tasks that were not required to be performed at a production rate, as well as only occasional workplace changes, little independent decision-making, and no contact with the public. (R. at 1769.) Thus, despite the ALJ's misstatement of Plaintiff's GAF score, such error is harmless because the Social Security Administration no longer relies on GAF scores and substantial evidence otherwise supports the ALJ's evaluation of Plaintiff's mental impairments.

3. The ALJ Adequately Accounted for Plaintiff's Limitations in Concentration, Persistence, and Pace.

Plaintiff raises several issues regarding the ALJ's determination that Plaintiff has moderate limitations in concentration, persistence, and pace. First, Plaintiff argues that the ALJ failed to explain how Plaintiff's limitation to do "simple and routine tasks . . . not performed at a production rate" adequately addressed Plaintiff's "deficiencies in concentration, persistence, or pace." (Pl.'s Mem. at 11.) Plaintiff also argues that the ALJ failed to include a limitation in concentration or "task persistence" in Plaintiff's residual functional capacity, despite Plaintiff's moderate limitations in concentration, persistence, and pace. (Pl.'s Mem. at 16.) Finally, Plaintiff contends that the ALJ failed to set forth any explanation as to how the ALJ determined that an individual with moderate limitations in concentration, persistence, or pace "would be capable of maintaining, concentration, attention, and pace for 85 percent of the workday." (Pl.'s Mem. at 14.) The Court will address each argument, and Defendant's response, in turn.

*a. The ALJ Did Not Err in Limiting Plaintiff to Simple and Routine Tasks That Were Not Performed at a Production Rate.*

Plaintiff argues that the ALJ failed to explain how Plaintiff's limitation to do "simple and routine tasks . . . not performed at a production rate" adequately addressed Plaintiff's "deficiencies in concentration, persistence, or pace." (Pl.'s Mem. at 11.) Further, Plaintiff contends that the ALJ failed to provide any explanation of the term "not performed at a production rate," and as a result, the ALJ's residual functional capacity assessment "defies review." (Pl.'s Mem. at 14.) Defendant responds that the ALJ supplied the necessary "logical bridge" between the evidence and Plaintiff's residual functional capacity, and the provided context permits adequate review. (Def.'s Mem. at 22-25.)

If the ALJ finds that the claimant has moderate limitations at step three, the ALJ must address those limitations when formulating a claimant's residual functional capacity. *Mascio*, 780 F.3d at 638. Here, the ALJ found that Plaintiff has a moderate limitation with regard to concentrating, persisting, or maintaining pace. (R. at 1765.) To support this limitation, the ALJ acknowledged Plaintiff's symptoms of depressive thoughts, anxiety, fear, and diminished energy, but also noted Plaintiff's "largely unremarkable mental status examinations, which showed intact attention and concentration skills and fair insight and judgment." (R. at 1765.) Between steps three and four, therefore, the ALJ assessed the evidence and addressed Plaintiff's step-three limitations in his residual functional capacity formulation. (R. at 1766-71.) To account for, in part, Plaintiff's difficulty maintaining concentration and other psychiatric symptoms, the ALJ determined that the Plaintiff should be limited to performing simple and routine tasks that were not required to be performed at a production rate "such as that found in an assembly-line setting and with instructions that were primarily spoken rather than written." (R. at 1766, 1769.) The ALJ formulated Plaintiff's

23

residual functional capacity after providing a chronological narrative of Plaintiff's testimony, alleged symptoms, medical record, and opinion evidence.

Plaintiff argues that the phrase "production rate pace" is ambiguous, relying, in part, on *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019). In that case, the ALJ determined a residual functional capacity that limited the claimant, in part, to "no work requiring a production rate or demand pace." *Id.* at 310. The claimant appealed the ALJ's denial of benefits, contending that the ALJ failed to provide a logical explanation of how the ALJ weighed the evidence and determined the residual functional capacity. *Id.* at 311. The Fourth Circuit agreed, in part, because the ALJ did not provide enough information to understand what the phrase "production rate or demand pace" meant. *Id.* at 312.

However, the holding in *Thomas* "did not create a categorical rule that failing to define certain terms constitutes a reversible error." *Taylor v. Saul*, No. 3:19-CV-468, 2020 WL 4340536, at *6 (E.D. Va. July 27, 2020). Instead, the Fourth Circuit has clarified that a reviewing court's ability to understand phrases such as "production rate of pace" in an ALJ's opinion depends on the phrase's context and use. In *Sizemore v. Berryhill*, for example, the Fourth Circuit affirmed the ALJ's residual functional capacity determination that limited the claimant to "non-production jobs." 878 F.3d 72, 81 (4th Cir. 2017). The Fourth Circuit later reconciled *Sizemore* with *Thomas*:

> [I]n contrast to this case and to *Thomas*, the ALJ in *Sizemore* provided additional context, explaining that the claimant could perform work only in a "low stress" setting, without any "*fast-paced work*" or "public contact," to account for moderate limitations in concentration, persistence and pace.

*Perry v. Berryhill*, 765 F. App'x 869, 872 n.1 (4th Cir. 2019) (emphasis added).

Similarly, the ALJ in *Taylor* provided sufficient context for the limitation that the claimant "cannot perform work at a production rate pace, but she can complete goal-oriented work." 2020 WL 4340536, at *6 (internal quotation marks omitted). This Court held that the ALJ's contrast

24

between "production rate pace" and "goal-oriented work" was sufficient to allow the Court to "understand the distinction between the terms the ALJ described." *Id*. The Court also noted that the ALJ discussed the claimant's "ability to complete tasks, even though she had difficulties performing at a *fast pace*." *Id.* (emphasis added); *but see Kane v. Saul*, No. 3:18CV746, 2019 WL 7562760, at *16 (E.D. Va. Aug. 20, 2019) (finding that the ALJ failed to explain the meaning of the phrase, "non-production oriented work setting"), *report and recommendation adopted*, No. 3:18-CV-746, 2020 WL 130134 (E.D. Va. Jan. 10, 2020).

In the instant case, this Court can understand the phrase "production rate pace" included in Plaintiff's residual functional capacity determination. Unlike the ALJ in *Thomas*, the ALJ here followed "production rate pace" with further description: "as that found in an assembly-line setting and with instructions that were primarily spoken rather than written." (R. at 1766.) This additional description permits this Court to understand that, to allow for Plaintiff's moderate limitations in maintaining concentration, persistence, and pace, Plaintiff shall not be required to perform tasks within a certain time allotment, like what would be present in an assembly-line setting. Courts have similarly held that such temporal descriptions relating to "assembly line" work sufficiently explain an ALJ's limitation to "production rate pace." *See Nelson v. Saul,* No. 4:18-CV-163-D, 2019 WL 4748028, at *5 (E.D.N.C. Aug. 29, 2018); *see also Teresa B. v. Comm'r Soc. Sec. Admin.*, No. 18-2280, 2019 WL 2503502, at *2 (D. Md. June 17, 2019).

Further, Plaintiff argues that such a limitation to simple and routine tasks not performed at a production rate, like that found in an assembly-line setting, fails to adequately account for moderate limitations in concentration, persistence, and pace. (Pl.'s Mem. at 15-16.) To support his contention, Plaintiff relies on the Fourth Circuit's language in *Mascio*, which provides, "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting

the hypothetical question to simple, routine tasks or unskilled work.'" 780 F.3d at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). In *Mascio*, the Court further opined that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, and pace." *Id.*

Subsequently, the Fourth Circuit has addressed its *Mascio* opinion, explaining that limitations in concentration, persistence, and pace may be implicitly accounted for, since "[t]he inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019)). The *Shinaberry* Court explained that, since the ALJ discussed in detail the plaintiff's psychological evaluations as well as "sufficiently explained why the mental limitation to simple, routine, and repetitive tasks accounted for" the plaintiff's moderate limitations in concentration, persistence, or pace, the ALJ's findings were supported by substantial evidence. *Id.* at 121-22. The ALJ's decision in *Shinaberry*, therefore, was unlike that in *Mascio*, where the ALJ "ignor[ed] (*without explanation*) [the plaintiff's] moderate limitations in her ability to maintain her concentration, persistence, or pace." *Mascio,* 780 F.3d at 633 (emphasis added).

Similar to the ALJ in *Shinaberry*, the ALJ in the instant case provided a narrative discussion in his review of the record. (R. at 1766-71.) Despite Plaintiff's symptoms of depression and anxiety, including memory deficits and fluctuating task engagement, the ALJ highlighted that Plaintiff "exhibited normal attention and concentration skills," "showed intact cognitive functioning in a wide array of testing, including immediate auditory and visual attention," and "could follow three-step commands and could perform serial sevens." (R. at 1769-70.) Still, the ALJ accounted for Plaintiff's symptoms and difficulty maintaining concentration by limiting

Plaintiff to simple and routine tasks that were not required to be performed at a production rate, like that of an assembly-line. (R. at 1769.) As discussed above, the ALJ went beyond limiting Plaintiff to simple, routine tasks because the ALJ added further temporal limitations, providing that the Plaintiff not perform tasks at a production rate such as that found in an assembly-line setting with instructions that were primarily spoken rather than written. A limitation on certain time restrictions, as would be found in an assembly-line setting, speaks to Plaintiff's ability to stay on task. Requiring primarily spoken instructions further accommodates for Plaintiff's difficulties in maintaining concentration. The ALJ therefore adequately accounted for Plaintiff's moderate limitations in concentration, persistence, or pace by limiting Plaintiff to "simple and routine tasks that were not performed at a production rate such as that found in an assembly-line setting and with instructions that were primarily spoken rather than written." (R. at 1766.)

Through his narrative discussion of Plaintiff's record, the ALJ provided an adequate explanation of the evidence upon which he relied to determine Plaintiff's limitation to "simple and routine tasks that were not performed at a production rate." Moreover, the descriptions following "production rate," along with the ALJ's thorough narrative discussion between steps three and four, enable the Court to meaningfully review the ALJ's decision. Substantial evidence, therefore, supports the ALJ's decision and accordingly, the ALJ did not err.

*b. The ALJ Adequately Accounted for Plaintiff's Moderate Limitations in Concentration, Persistence, and Pace in Formulating Plaintiff's Residual Functional Capacity.*

Plaintiff contends the ALJ failed to account for Plaintiff's moderate limitations in concentration, persistence, and pace in formulating Plaintiff's residual functional capacity. Plaintiff argues that the ALJ failed to explain how he determined that an individual with moderate limitations in concentration, persistence, and pace would be capable of staying on task for eighty-five percent of the workday. (Pl.'s Mem. at 15-16.) Defendant responds that Plaintiff's arguments

27

fail, because Plaintiff relies on the vocational expert's testimony that was not ultimately relied on by the ALJ. (Def.'s Mem. at 25.)

Plaintiff's argument is factually flawed—the ALJ did not find that Plaintiff would be off task for fifteen percent or more during an eight-hour workday. Indeed, the "ALJ is not required to accept the vocational expert's opinion for a hypothetical based on limitations that the ALJ did not include in the [residual functional capacity]." *Prim v. Colvin*, No. 7:14CV00135, 2015 WL 4757104, at *4 (W.D. Va. Aug. 11, 2015); *see also Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon consideration of all other evidence in the record." (quoting *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989))).

During the hearing, the ALJ posed several hypotheticals to the vocational expert, so that the vocational expert could offer testimony about any jobs existing in the national economy that the claimant could perform. (R. at 1808-10.) After the ALJ posed a hypothetical that encompassed Plaintiff's residual functional capacity, to which the vocational expert provided that the positions of type copy examiner, conductor bonder, and surveillance system monitor would be available, the ALJ asked the vocational expert to "[a]ssume a loss of productivity during a typical-eight hour workday of 15 percent of or more," and then asked if there would be any competitive work available. (R. at 1810.) The vocational expert explained that no work would be available to such an individual. (R. at 1810.) The ALJ, however, did not ultimately include such a limitation in Plaintiff's residual functional capacity. *See Walker*, 889 F.2d at 50 (explaining that the hypothetical questions posed to the vocational expert must accurately represent the claimant's residual functional capacity). Instead, as discussed at length above, the ALJ relied on Plaintiff's medical record and provided for several limitations to accommodate for Plaintiff's moderate

limitations in concentration, persistence, or pace. Accordingly, the ALJ did not err by failing to explain how Plaintiff possessed the ability to concentrate, persist, and maintain pace throughout an eight-hour workday with only a fifteen percent loss of productivity, because the ALJ did not make such a finding.

4.   The ALJ Properly Evaluated Plaintiff's Impairments in Combination.

Plaintiff argues that the ALJ failed to evaluate the combination of Plaintiff's impairments. (Pl.'s Mem. at 16-18.) Specifically, Plaintiff avers that, despite Plaintiff's numerous diagnosed ailments, the ALJ "made no determination of the cumulative effects" of all of Plaintiff's impairments. (Pl.'s Mem. at 17-18.) Defendant responds that the ALJ considered Plaintiff's impairments at all relevant steps of the sequential evaluation process. (Def.'s Mem. at 28.)

In determining whether a claimant has physical or mental impairments that are of "a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law," the ALJ must consider the combined effects of all of the claimant's impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity." § 404.1523(c); *see also Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir. 1986). The requirement to consider the combined effect of impairments "merely elaborates upon the general requirement that an ALJ is required to explicitly indicate the weight given to the relevant evidence." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989).

To support his argument, Plaintiff relies, in part, on *Cook v. Heckler,* where the ALJ made "*wholly independent* evaluations" of the plaintiff's impairments and failed to consider the combined effect of the plaintiff's multiple impairments. 783 F.2d at 1174 (emphasis added). Unlike the ALJ in *Cook*, however, the ALJ in the instant case considered the interplay of Plaintiff's numerous impairments. At step two, the ALJ determined that Plaintiff suffered from the following

29

severe impairments: left shoulder impairment, degenerative disc disease of the cervical spine, rheumatoid arthritis, osteoarthritis, syncope, right knee impairment, right Hallux Valgus deformity, somatoform disorder, depressive disorder, and anxiety disorder. (R. at 1764.) The ALJ further opined that these severe impairments significantly limit Plaintiff's ability to perform basic work activities. (R. at 1764.) At step three, the ALJ considered the cumulative effect of Plaintiff's impairments in determining if singly or in combination, Plaintiff suffered from an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1764-65.)

In determining Plaintiff's residual functional capacity, the ALJ thoroughly reviewed Plaintiff's record, including discussion of Plaintiff's disc herniation and protrusion, plantar calcaneal spurs, chondromalacia, small joint effusion, Hallux Valgus deformity, fainting and seizure-like episodes, rheumatoid arthritis, neck and lower back pain, left shoulder pain, syncope, depression, and anxiety. (R. at 1767-70.) In reviewing Plaintiff's record, the ALJ provided a narrative discussion, explaining the weight assigned to specific evidence based on its consistency with the record as a whole. (R. at 1767-70.) In reviewing the opinions rendered by Drs. Biddison and Nakhuda, the ALJ explained that he was assigning the opinions only partial weight because "their opinions do not adequately account for the combined effect of the claimant's impairments, including his history of syncope, which limited to him performing no more than sedentary work"— further underscoring the ALJ's acknowledgement of the importance of considering the combined effects of impairments. (R. at 1771.) Given these references, the ALJ sufficiently considered Plaintiff's combination of impairments. *See Matthew P. v. Saul*, No. 1:19-CV-01191, 2020 WL 7391297, at *8 (E.D. Va. Nov. 23, 2020). The ALJ's decision, therefore, permits meaningful review and the ALJ did not err.

**B. Substantial Evidence Supports the ALJ's Conclusion that a Significant Number of Jobs Exist in the National Economy that Plaintiff Could Perform.**

Plaintiff argues that the ALJ erred in relying upon the testimony of the vocational expert. Specifically, Plaintiff contends that the hypothetical question posed to the vocational expert at the administrative hearing failed to accurately reflect Plaintiff's residual functional capacity. (Pl.'s Mem. at 4-6.) Defendant responds that the ALJ correctly relied on the vocational expert's testimony to find that a significant number of other jobs existed in the national economy that Plaintiff could perform. (Def.'s Mem. at 16.)

At the fifth step of the sequential analysis, the ALJ must show that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant could perform other work existing in significant numbers in the national economy. §§ 404.1520(g), 404.1566. The ALJ can carry his burden in the last step with the testimony of a vocational expert. § 404.1566(e). During an administrative hearing, the ALJ must pose hypothetical questions to the vocational expert that accurately represent the claimant's residual functional capacity, so that the vocational expert can offer testimony about any jobs existing in the national economy that the claimant could perform. *Walker*, 889 F.2d at 50. Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the vocational expert be "relevant or helpful." *Id.*; *see also Hines v. Barnhart*, 453 F.3d 559, 567 (4th Cir. 2006) (finding that the vocational expert's testimony had no value, because he did not take all of the claimant's impairments into account).

Courts in the Fourth Circuit have, however, repeatedly held that the hypotheticals posed to a vocational expert need not be a literal recitation of a claimant's residual functional capacity. *See, e.g., Russell v. Barnhart*, 58 F. App'x 25, 30-31 (4th Cir. 2003) (finding that the ALJ adequately captured the plaintiff's diminished intellectual capacity by including limitations in the hypothetical

31

about the plaintiff's ability to maintain attention); *Jones v. Astrue*, 2010 WL 4923294, at *11 (D. Md. Nov. 29, 2010) (holding that it was "not fatal" for the ALJ to describe the plaintiff's limitations instead of using exact terminology). A hypothetical, therefore, is appropriate if it adequately reflects the limitations supported by the record, even though it may not precisely capture a claimant's residual functional capacity. *Powell v. Astrue*, 2013 WL 3776948, at *7 (D. Md. July 7, 2013). Moreover, if an ALJ fails to account for a limitation in his hypothetical to a vocational expert, a court will not recommend remand if the omission would not change the outcome of the decision. *Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005). Accordingly, if the jobs listed by the vocational expert in response to a hypothetical ultimately account for the omitted limitation(s), the Court will affirm the ALJ's step-five determination. *See McClellan v. Comm'r, Soc. Sec. Admin.*, No. 12-1767, 2013 WL 1703879, at *4 (D. Md. Apr. 18, 2013) (finding that the ALJ committed harmless error when omitting the plaintiff's climbing limitations from his hypotheticals because the jobs listed by the vocational expert did not require climbing).

During Plaintiff's hearing, the ALJ solicited testimony from vocational expert Christina Cody, posing several hypotheticals to the vocational expert based on possible residual functional capacity limitations. (R. at 1807-12.) As relevant here, the ALJ asked the vocational expert to consider an individual with Plaintiff's age, education and past work. (R. at 1808.) In this hypothetical, the individual is limited to sedentary work, as well as the following limitations:

> The individual should not even occasional exposure to hazards such as unprotected heights and moving mechanical parts. The individual should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl. They would never climb ladders, ropes or scaffolds. They should have no overhead reaching bilaterally and no more than frequent reaching in every other direction, handling and fingering bilaterally. They would be limited to the performance of simple and routine tasks not at a production rate such as found in an assembly line setting. *There should be no more than occasional contact with supervisors, coworkers and the public.*

(R. at 1808-09 (emphasis added).) The ALJ asked the vocational expert whether there was any work that such an individual could do. (R. at 1808.) The vocational expert responded that such a person could perform the representative occupations of type copy examiner, conductor bonder, and surveillance system monitor. (R. at 1810.) Counsel for Plaintiff asked whether an individual's ability to read and understand what they have read would have an impact on the above listed occupations. (R. at 1811.) The vocational expert responded that the type copy examiner position "would not require reading or comprehension," and that the other positions mentioned "do not require reading." (R. at 1811.)

The ALJ relied on the vocational expert's testimony for the hypothetical to conclude that Plaintiff did not qualify as disabled because Plaintiff could perform other work existing in the national economy, including work as type copy examiner, conductor bonder, and surveillance system monitor. (R. at 1772.) The hypothetical, however, did not precisely recount the limitations listed in Plaintiff's residual functional capacity. Specifically, the hypothetical described an individual who could perform work that involved *no more than occasional* contact with supervisors, co-workers, and the public, while the residual functional capacity provided for *no contact with the public* and no more than occasional contact with supervisors or co-workers. (R. at 1766, 1808-09.) Further, while the residual functional capacity provided for "instructions that were primarily spoken rather than written," the hypothetical presented to the vocational expert did not include a limitation related to Plaintiff's ability to read. (R. at 1766, 1811.) Given the ALJ's omissions, therefore, the Court must recommend remand unless these omissions are adequately described in the phrasing of the hypothetical or otherwise constitute harmless error.

Again, when confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine. *See Mascio*, 780 F.3d at 639; *see also Sharp,* 600 F.

App'x at 252. Against this standard, the Court concludes that the ALJ's misstatement of Plaintiff's residual functional capacity in the hypothetical posed to the vocational expert constitutes harmless error. Regarding contact with the public, the representative occupations of type copy examiner and conductor bonder do not require contact with the public. According to the Dictionary of Occupational Titles, both type copy examiner and conductor bonder, for example, require "not significant" interactions with people. DICOT 979.687-026, 1991 WL 688696 ("People: 8- Taking Instructions-Helping N-Not Significant); DICOT 726.685-066, 1991 WL 679631 (same). The "8" ranking is the lowest level of public interaction possible and "indicates no public work activity." *See Castaneda v. Astrue*, No. EDCV 11-0508, 2012 WL 528326, at *7 (C.D. Ca. Feb. 15, 2012) (finding a job description with an 8 ranking requires no public work activity). Thus, regarding public interaction, the ALJ's omission does not yield a different result concerning the availability of jobs in the national economy. *See Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 835-37 (N.D.W. Va. 2009) (ALJ's failure to include machinery exposure in residual functional capacity found to be harmless where error would not have resulted in different finding regarding availability of jobs).

The error regarding Plaintiff's ability to read is similarly harmless. Although the hypothetical presented to the vocational expert did not include a limitation related to Plaintiff's ability to read, Plaintiff's counsel asked the vocational expert whether the representative occupations provided by the vocational expert in response to the ALJ's hypothetical required an ability to read. (R. at 1811.) The vocational expert answered that "the type copy examiner would not require reading or comprehension" and that conductor bonder and surveillance system monitor occupations "do not require reading." (R. at 1811.); *see also* DICOT 979.687-026, 1991 WL 688696 (requiring "commonsense understanding to carry out detailed but uninvolved written *or oral* instructions" for type copy examiner (emphasis added)); *see also* DICOT 726.685-066, 1991

34

WL 679631 (requiring same limitation for conductor bonder). The vocational expert further provided that such testimony was consistent with the Dictionary of Occupational Titles. (R. at 1811-12.) Because the vocational expert clarified that none of the representative occupations required reading, the ALJ did not err by limiting Plaintiff to instructions that were *primarily* spoken rather than written. (R. at 1766.) For these reasons, the vocational expert's testimony is not in conflict with the limitation included in Plaintiff's residual functional capacity.

While the ALJ erred by omitting Plaintiff's limitations regarding an ability to read and to interact with the public from the hypothetical, such error was harmless because there is no evidence that the inclusion of such limitations would have yielded a different finding concerning the availability of jobs in the national economy. Substantial evidence, therefore, supports the ALJ's conclusion that occupations suitable for Plaintiff, given his residual functional capacity, exist in significant numbers in the national economy.

## VI. CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and the final decision of the Commissioner be AFFIRMED.

Let the Clerk file a copy of this Report and Recommendation electronically, notify all counsel of record and forward a copy to United States District Judge John A. Gibney.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

Elizabeth W. Hanes
United States Magistrate Judge

Richmond, Virginia
Date: February 10, 2021